IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

**EDWARD ACKLEY,**

    Plaintiff,

v.

**MICHAEL J. ASTRUE, Commissioner of Social Security,**

    Defendant.

Case No. CV 10-185-SI

**OPINION AND ORDER**

Rory Linerud
P.O. Box 1105
Salem, Oregon 97308
    Attorney for Plaintiff

Dwight C. Holton
United States Attorney
District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

Benjamin J. Groebner
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
    Attorneys for Defendant

///

Opinion and Order Page 1

**SIMON, District Judge:**

## I. INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Edward Ackley for Disability Insurance Benefits ("DIB"). Mr. Ackley alleges disability on the basis of anxiety and depression, irritable bowel syndrome ("IBS"), carpal tunnel syndrome ("CTS"), and morbid obesity. Mr. Ackley asserts that the Commissioner erred at step five of the sequential analysis by failing to incorporate all of his impairments into the ALJ's residual functional capacity ("RFC") assessment, thereby presenting the Vocational Expert ("VE") with an incomplete hypothetical question. Mr. Ackley asserts further that the VE's testimony was inconsistent with the Dictionary of Occupational Titles. For the reasons that follow, the Commissioner's decision is affirmed.

## II. BACKGROUND

Mr. Ackley filed an application for benefits on September 6, 2006, alleging disability since August 31, 2005. The application was denied both initially and on reconsideration. Administrative Law Judge ("ALJ") Joel T. Elliott held a hearing on July 21, 2009. On September 22, 2009, the ALJ issued a decision finding Mr. Ackley not disabled. When the Appeals Council denied review, the ALJ's decision became the Commissioner's final decision.

Born in 1960, Mr. Ackley was 48 years old at the time of the ALJ's decision. His date last insured is December 31, 2011.[1] Mr. Ackley has not engaged in substantial gainful activity

---

[1] In a DIB case, the claimant must prove that the current disability began on or before the date last insured. *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).

Opinion and Order Page 2

since the alleged onset date, August 31, 2005. His past relevant work is as a bus driver.

**A.     Medical Evidence**

      1.     Depression and anxiety

On January 16, 2006, Mr. Ackley was given a mental health evaluation by Sue Davis, whose professional status does not appear in the record, at Kaiser Permanente. Tr. 226. Mr. Ackley reported being depressed since August 2005 after some physical illnesses, but doing better since starting medication the previous month. *Id.* Mr. Ackley denied having current thoughts of suicide. *Id.* He had been off work for several months, but was hoping to go back to work the following week. *Id.* Ms. Davis thought that Mr. Ackley had been moderately depressed during the previous two weeks. Tr. 227. On February 14, 2006, Mr. Ackley saw Ms. Davis again, describing difficulty sleeping, nightmares, and anxiety around crowds. Tr. 222.

On May 1, 2006, psychiatric nurse practitioner Carolyn Morris evaluated Mr. Ackley. Tr. 210. Mr. Ackley said he was off work on medical disability, and reported an eight-month history of depression with significant anxiety. Tr. 211. He was taking Prozac and Serax. *Id.* His chief complaint was anxiety in crowds. *Id.* Mr. Ackley said that until eight months earlier, he had had no history of anxiety or depression. He attributed the onset of the depression to a series of medical problems that resulted in protracted periods off work during the previous two years. Ms. Morris wrote, "Apparently none of these medical issues were life threatening or chronic," but Mr. Ackley was unable to participate "in frequent hunting, fishing and camping trips with his numerous friends and found himself unhappily at home." *Id.* Mr. Ackley said he felt better after his dosage of Prozac was increased, but he continued to have low energy, inability to focus, and low motivation, as well as episodic anxiety in social situations. Tr. 211-12. Mr. Ackley appeared

moderately depressed, with a somewhat subdued affect. *Id.* His speech was without latency or pressure, his thoughts well-organized. His insight, judgment, and memory were intact. *Id.*

On June 12, 2006, Ms. Morris wrote a letter on Mr. Ackley's behalf stating that he was temporarily disabled and unable to return to work. Tr. 272. On July 17, 2006, Mr. Ackley told Ms. Morris he was reducing his anxiety by riding buses every day for three to five hours a day and that he had not experienced symptoms while doing so. Tr. 204. He had also gone to his workplace and visited with other drivers, without problems. *Id.* A month earlier, however, he had had some anxiety in a local mall. *Id.* Ms. Morris thought Mr. Ackley showed major improvements with his depression and social isolation and noted that she would support his returning to work. *Id.* Ms. Morris also noted that she had written a letter for Mr. Ackley to give to TriMet. *Id.*; *see also* tr. 271 (letter dated July 17, 2006 to TriMet, giving opinion that Mr. Ackley was stable and could return to work).

On August 9, 2006, Ms. Morris wrote another letter to TriMet regarding Mr. Ackley, stating:

> In light of his recent attempt to return to work as a bus driver, I think he is unable to continue as a driver. His anxiety and high stress response are causing symptoms while driving which impair his ability to focus on his job. Because he is asymptomatic in other circumstances, I believe he can work in another capacity within your organization.

Tr. 270.

On September 5, 2006, Ms. Morris stated in a chart note that Mr. Ackley was

> now very anxious because on 9/27 it will have been one year since he worked 30 days, and he would automatically be severed from TriMet unless HR has reassigned him to a maintenance position before then, or agrees to extend the period of being employed without working. He asks for me to fill out paperwork for LT disability to protect him in the event that neither of the aforementioned events occur. He is having sleep issues, worrying and ruminating about his job

Opinion and Order Page 4

> life. He continues acutely anxious in crowds, was sweating and clearly distressed after sitting in the waiting room with 8-10 others for 20 minutes. Cannot tolerate higher dose of propranolol without headache, but current dose enables him to go out in public, get needs met, as long as he is not in a crowd. . . . . Client continues with agoraphobia, cannot work as bus driver, is now anxious about his future with TriMet. Did LT disability paperwork and sent this in.

Tr. 202-03.

On December 14, 2006, Mr. Ackley was evaluated by Peter Okulitch, Ph.D. Mr. Ackley related that he had been anxious and depressed for two years, withdrawing from people and crowds. He said he had to write notes to himself as reminders to shower or bathe. Tr. 293. Mr. Ackley felt he could no longer work effectively or safely as a TriMet bus driver. *Id.* His dislike of crowds caused him to do his shopping at night. *Id.* Because he was having suicidal thoughts, he had moved his gun collection to his sister's house. *Id.*

Mr. Ackley said he was receiving monthly mental health counseling at Kaiser Permanente. Tr. 294. He had never had any surgeries or serious illness, and had never been hospitalized for a psychiatric disorder. *Id.* He had been employed by TriMet for the past 13 years. *Id.* During the interview, he appeared optimistic and friendly, with some anxiety when the office door was closed. Tr. 295. His speech, mood and affect seemed normal, and he had no difficulties with short-term or long-term memory. *Id.* Mr. Ackley said he preferred living alone, keeping busy by working on his camping equipment and his firearm collection. Tr. 296. He said he was a "survival type" and enjoyed reading and practicing survival techniques. *Id.* He no longer enjoyed elk hunting with friends. *Id.*

Dr. Okulitch diagnosed Depression, Moderate, and Generalized Anxiety Disorder. *Id.* He thought Mr. Ackley's problems were treatable with medication and a support group. *Id.* In Dr. Okulitch's opinion, Mr. Ackley could manage money and perform both simple and complex

Opinion and Order Page 5

tasks. Tr. 296-97. Dr. Okulitch noted that Mr. Ackley had been able to get along with supervisors, co-workers and the public for a significant length of time. Tr. 297.

On January 3, 2007, reviewing psychologist Dorothy Anderson, Ph.D. completed a Mental RFC Assessment in which she rated Mr. Ackley as "moderately limited" in his ability to interact appropriately with the general public and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 313. In her explanation of this assessment, Dr. Anderson wrote, "Given [Mr. Ackley's] anxiety symptoms he does have occasional difficulties when working with others, but could work with them in brief indirect ways." Tr. 314. Dr. Anderson also thought Mr. Ackley not able to work directly with the public. *Id.* Reviewing psychologist Paul Rethinger, Ph.D. agreed with Dr. Anderson's assessment in a document dated March 13, 2007, noting that Mr. Ackley had "limitations with respect to working with the general public and co-workers." Tr. 324.

On December 8, 2007, Mr. Ackley was admitted to Wyoming State Hospital for depression with thoughts of suicide. Tr. 389. He was discharged on December 20, 2007, with a diagnosis of Major Depression, Recurrent, Severe. *Id.*

2. IBS

On April 13, 2005, Mr. Ackley saw Kenrick Jones, M.D. at Kaiser Permanente, with complaints of chest pain and diarrhea. Dr. Jones wrote that the chest pain was "atypical" for angina, and thought it might be chest wall pain or gastroesophageal reflux disorder ("GERD"). Dr. Jones prescribed Ranitidine and omeprazole for GERD. Dr. Jones diagnosed the diarrhea as IBS and prescribed dicyclomine, an anticholinergic. Tr. 246. A chart note dated October 9, 2005 states that "diarrhea has resolved." Tr. 235. On June 20, 2005, a CT scan of the abdomen and

Opinion and Order Page 6

pelvis revealed that the large and small bowel were within normal limits, without adenopathy or free fluid within the abdomen or pelvis. Tr. 274. Later records from Kaiser Permanente show no indication that Mr. Ackley sought further treatment for IBS or diarrhea.

    3.    <u>CTS</u>

On December 1, 2004, Mr. Ackley was seen at Kaiser Permanente complaining of wrist pain for the past week. Tr. 258. Upon examination, he revealed positive Tinnel's and Phalen's signs, indicative of CTS. *Id.* He was given a wrist brace to wear at work indefinitely and instructed to take anti-inflammatories for the next two weeks. *Id.*

**B.    Hearing testimony**

Mr. Ackley testified at the hearing that his anxiety and depression improved between March and December 2008, when he was receiving treatment from Cascadia, to the point that instead of being totally incapacitated, he was able to "build up to three and four hours a day" of going out, so long as he avoided large crowds and traffic. Tr. 40-41. He was able to drive himself to appointments, go to the grocery store, take walks, and sleep 10 hours a day rather than 16 to 18 hours. *Id.* Since ending treatment at Cascadia, he was living with his father because after getting out of the hospital in Wyoming he was looking for a long haul trucking job and had no income, so "I couldn't see renting a place." Tr. 42, 47. At his father's house, he spent "a lot of time" in his room and slept 16-18 hours a day. Tr. 42. Mr. Ackley said the last time he had driven to the store, weeks earlier, it "terrified me." *Id.*

With respect to the IBS, Mr. Ackley said, "Two, three hours after I eat I better be real close to the bathroom. And I can be in there anywhere from 10 minutes to 20 minutes just going." Tr. 44. He said doing fine work with his hands made them stiff and sore, and that he was

Opinion and Order Page 7

prone to dropping things. Tr. 45. His obesity meant that "[s]itting for a long time, I get a little lower back pain and my legs fall asleep. I have to get up and move around." Tr. 45. He also had difficulty getting up from low couches and trying to do heavy lifting. Tr. 45.

Gary Jesky, a VE, testified before the ALJ. The ALJ asked the VE to consider an individual of similar age, education, and work experience as Mr. Ackley, able to do work at the medium exertional level, but restricted from complex or skilled work or work with more than minimal interaction with the public. Tr. 57. The VE testified that because interaction with the public was a significant part of a bus driver's job, he could not return to that line of work. *Id.* The VE identified three medium exertion, semiskilled or unskilled jobs that did not involve significant interaction with the public: janitorial jobs; warehouse worker jobs; and laundry work jobs. Tr. 58. The ALJ asked whether, if an individual performing any of those jobs needed "ready access to a rest room at the work site," the VE's opinion would be different. Tr. 59. The VE responded that he did not believe this condition would have a significant impact. *Id.* On cross examination, Mr. Ackley's attorney asked if competitive employment would be ruled out for a person who would miss on average two or more days per month. Tr. 60. The VE answered that it would "result in problems sustaining competitive employment." *Id.*

### C. The Sequential Evaluation

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. At step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner proceeds to step two, to determine whether the claimant has a "medically severe impairment or

Opinion and Order Page 8

combination of impairments." *Yuckert,* 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the impairment is severe, the evaluation proceeds to the third step, where the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert,* 482 U.S. at 140-41. If a claimant's impairment meets or equals one or more of the listed impairments, the claimant is considered disabled without consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the RFC to do other work in consideration of the claimant's age, education and past work experience. *Yuckert,* 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

D.  **The ALJ's Decision**

At step two of the sequential analysis, the ALJ found that Mr. Ackley's depression, anxiety, IBS, and obesity were severe impairments. Tr. 10. Although the medical record revealed that Mr. Ackley had been treated for other complaints, including left shoulder pain, carpal tunnel syndrome, and lumbar pain, the ALJ found that these were not severe impairments.

///

At step three, the ALJ concluded that Mr. Ackley's impairments, individually or in combination, did not meet or medically equal one of the listed impairments. At step four, the ALJ found that Mr. Ackley had the RFC to perform a limited range of medium exertion work that was unskilled, not complex, and with minimal public interaction. He found that Mr. Ackley was also required to have ready access to a restroom. Tr. 13. The ALJ did not find restrictions based on Mr. Ackley's obesity, noting evidence showing that Mr. Ackley had reported no difficulties with sitting, walking, climbing, or standing, and said he was walking and riding a bicycle frequently. Tr. 14.

The ALJ found that although Mr. Ackley reported no social activities, the evidence documented his attendance at individual and group counseling sessions, visits with family members, searches for part-time work, interactions with others in the household, and social contacts with former co-workers. *Id.* On the basis of this evidence, the ALJ found that "[w]hile the claimant prefers to remain alone, he is able to function around the public." *Id.* The ALJ found that because Mr. Ackley worked on his camping equipment, read, and practiced survival techniques, he had the ability to concentrate, pay attention, and follow directions. *Id.*

The ALJ gave "moderate" weight to the opinion of Dr. Okulitch that Mr. Ackley could perform simple and complex tasks, get along with supervisors, co-workers, and the general public. Tr. 15. Although the ALJ agreed in large part with Dr. Okulitch's assessment, the ALJ found no evidence that Dr. Okulitch had a complete medical file upon which to assess limitations, and concluded that Mr. Ackley was more limited than Dr. Okulitch thought. The ALJ found that while Mr. Ackley was capable of getting along with the public, he had "increased

anxiety with public interaction." The ALJ also thought Mr. Ackley's mental impairments required restricting Mr. Ackley from performing complex or skilled tasks. *Id.* The ALJ noted that Carolyn Morris had opined that Mr. Ackley was unable to perform his job as a bus driver because he could not work in situations involving crowds or small groups of people in crowded areas, but she did not offer an opinion about Mr. Ackley's ability to work in jobs involving minimal or no public contact. *Id.* At step four, the ALJ found that Mr. Ackley could not return to his previous work as a bus driver. At step five, the ALJ relied on the testimony of the VE that an individual with the RFC as found by the ALJ could perform work such as janitor, warehouse worker, and laundry worker, all medium level unskilled jobs.

## II. STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## III. DISCUSSION

**A.    Step five finding on interactions with co-workers**

Opinion and Order Page 11

Mr. Ackley asserts that the ALJ's step five conclusions failed to take into account the limitations found by reviewing psychologists Anderson and Rethinger that Mr. Ackley was able to work only briefly and indirectly with co-workers because of anxiety. Mr. Ackley argues that two of the jobs identified by the VE-- laundry worker and warehouse worker--are, as identified in the Dictionary of Occupational Titles ("DOT"),[2] inconsistent with the limitation found by Doctors Anderson and Rethinger because the jobs involve "taking instructions and helping" when dealing with people.[3]

The argument is unpersuasive. First, nothing in the DOT's explanation of an "8" as the fifth digit of the Occupational Code Number suggests that it has any significance with respect to co-worker contact. Second, the detailed descriptions of laundry worker and warehouse worker do not suggest something other than brief and indirect contact with co-workers.

The DOT describes Laundry Worker II (DOT 361.685-018) as follows:

---

[2] DOT is a publication of the United States Department of Labor that gives detailed requirements for a variety of jobs. The Social Security Administration has taken administrative notice of the DOT. *Massachi v. Astrue*, 486 F.3d 1149, 1153 n. 8 (9th Cir. 2007). *See* United States Department of Labor, DOT (4th ed. 1991), available at www.occupationalinfo.org/contents.html. The Social Security Administration relies "primarily on the DOT" for "information about the requirements of work in the national economy" at steps four and five of the sequential evaluation process. SSR 00-4p, 2000 WL 1898704 *2 (SSA) (Use of vocational experts and occupational information in disability decisions).

[3] Mr. Ackley is referring to the explanation of the Occupational Code Number as used in the DOT. Each of the three digits in the 9-digit "occupational code" (i.e., 361.685-018 for laundry worker and 922.687-058 for warehouse worker) has a specific meaning. The middle three digits of the code (i.e., 685 and 687) are Worker Functions ratings, which are based on the DOT's assumption that every job requires a worker to function in relation to data, people, and things. The worker's relationship to people is expressed in the fifth digit of the Occupational Code Number, a number between "0," and "8," with lower numbers indicating jobs that require mentoring, instructing and supervising other people. The fifth digit is "8" for both occupations identified here; it represents "taking instructions/helping," the "least complicated" worker function with respect to other people.

>Tends laundering machines to clean articles, such as rags, wiping cloths, filter cloths, bags, sacks and work clothes: Loads articles into washer and adds specified amount of detergent, soap, or other cleaning agent. Turns valve to fill washer with water. Starts machine that automatically washes and rinses articles. Lifts clean, wet articles from washer and places them successively into wringers and driers for measured time cycles. Sorts dried articles according to identification numbers or type. Folds and places item in appropriate storage bin. Lubricates machines, using grease gun and oil can. May dissolve soap granules in hot water and steam to make liquid soap. May mend torn articles, using needle and thread. May sort and count articles to verify quantities on laundry lists. May soak contaminated articles in neutralizer solution in vat to precondition articles for washing. May mix dyes and bleaches according to formula, and dye and bleach specified articles. May be designated according to article cleaned as Bag Washer (any industry); Cloth Washer (any industry); Color-Straining-Bag Washer (textile); Oil-Rag Washer (any industry); Wiping-Rag Washer (tex.prod., nec).

>The DOT describes the warehouse worker position (DOT 922.687-058) as follows:

>Performs any combination of following tasks to receive, store, and distribute material, tools, equipment, and products within establishments: Reads production schedule, customer order, work order, shipping order, or requisition to determine items to be moved, gathered, or distributed. Conveys materials and items from receiving or production areas to storage and to other designated areas by hand, handtruck, or electric handtruck. Sorts and places materials or items on racks, shelves, or in ins according to predetermined sequence, such as size, type, style, color, or product code. Sorts and stores perishable goods in refrigerated rooms. Fills requisitions, work orders, or requests for materials, tools, or other stock items and distributes items to production workers or assembly line. Assembles customer orders from stock and places orders on pallets or shelves, or conveys orders to packing station or shipping department. Marks materials with identifying information, using stencil, crayon, or other marking device. Opens bales, crates, and other containers, using handtools. Records amounts of materials or items received or distributed. Weighs or counts items for distribution within plant to ensure conformance to company standards. Arranges stock parts in specified sequence for assembly by other workers. May use computer to enter records. May compile worksheets or tickets from customer specifications. . . . May drive vehicle to transport stored items from warehouse to plant or to pick up items from several locations for shipment. May complete requisition forms to order supplies from other plant departments. May prepare parcels for mailing. May maintain inventory records. May restock aircraft commissary supplies, such as linens, glasses, emergency kits, and beverages, and be designated Commissary Agent (air trans.) May be known according to specific duty performed as Cloth-Bin Packer (textile); Cooler Worker (dairy products); Order Filler (any industry); Produce Clerk (retail trade) II; Tool Chaser (any industry).

Opinion and Order Page 13

The court concludes that the jobs of laundry worker and warehouse worker are not, under the DOT descriptions, inconsistent with a requirement that the worker have only brief and indirect contact with co-workers.

**B.    Step five findings on access to restroom**

Mr. Ackley also asserts that the ALJ made a similar error with respect to Mr. Ackley's IBS, finding that Mr. Ackley could work only at jobs that provided ready access to a restroom, but failing to give consideration to Mr. Ackley's testimony that he required 10-20 minutes in the restroom a few hours after each meal. Mr. Ackley argues that his requirement of 10-20 minute periods in the restroom within a few hours of eating would necessarily rule out the jobs described by the VE.

The argument is unpersuasive for two reasons. First, the ALJ's hypothetical to the VE included the requirement of "ready access to a restroom." That requirement is not on its face inconsistent with the need to spend 10 or more minutes in the restroom a few hours after eating a meal. Second, there is no evidence from the VE that needing to spend 10-20 minutes in the restroom after a meal would necessarily preclude Mr. Ackley from performing the jobs identified. The VE was asked only whether absences from work two or more days a month would rule out competitive employment, and the VE testified that they would. There is no evidence in the record to suggest that Mr. Ackley's need to use the restroom for 10-20 minutes a few hours after a meal is not accommodated by the ALJ's requirement that he have ready access to a restroom.

///

### C.    Step five finding of minimal public interaction

Mr. Ackley further asserts that the janitor work identified by the VE is inconsistent with the ALJ's restriction of minimal public interaction because the DOT's description of Janitor (any industry), Code 382.664-010, includes the sentence, "Cautions tenants regarding complaints about excessive noise, disorderly conduct, or misuse of property." The argument is unpersuasive. First, speaking to tenants about specific matters is not inconsistent with the RFC limiting Mr. Ackley to minimal public interaction. Minimal interaction is not the same as no interaction. Second, the ALJ made findings, based on substantial evidence in the record, that Mr. Ackley was able to grocery shop, attend individual and group counseling sessions, visit family members, socialize with former co-workers at Tri-Met, look for part-time work, ride the bus for up to four hours a day, three days a week to reduce anxiety, and interact with others in the household. The court finds no error here by the ALJ.

### D.    Step five findings on obesity

Finally, Mr. Ackley argues that the ALJ failed to consider the effect of his obesity, found to be a severe impairment, on his ability to work and consequently in the hypothetical question to the VE. Mr. Ackley acknowledges that the ALJ took note of Mr. Ackley's having not reported difficulties in sitting, walking, climbing, standing or other physical limitations. Tr. 14. He argues, however, that the ALJ should have found that he was unable to sit for extended periods because Mr. Ackley testified that upon "sitting for a long time, I get a little lower back pain and my legs fall asleep. I have to get up and move around." Tr. 45.

The court finds no indication in the record that any of the jobs identified by the VE and relied upon by the ALJ at step five involved sitting for extended periods. Even if the ALJ should

Opinion and Order Page 15

have found that Mr. Ackley's obesity prevented him from sitting for extended periods, the error was harmless because it was inconsequential to the ultimate non-disability determination at step five. *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006) (to be harmless, the ALJ's error must be inconsequential to the ultimate non-disability determination).

## IV. CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this 19th day of September, 2011.

Michael H. Simon
United States District Judge